The last case on the argument calendar this morning is Benay, if I'm pronouncing that correctly, v. Warner Bros. Entertainment, et al. Good morning, Your Honors. My name is Sylvia Havens with Manning & Martyr cast Elrod Ramirez appearing on behalf of the plaintiffs, Aaron and Matthew Benay. This is a case about my client's script, The Last Samurai, and defendant's movie by the same exact title, The Last Samurai. We're here following the grant of a summary judgment, so it's de novo review. I think we have a final judgment. We do, Your Honor. Final as to all parties, all counts. And there are two counts. There's an implied contract under California law, and there is a copyright claim. As to the implied contract claim, the district court granted summary judgment on the basis that it deemed there was no novelty. That's wrong on the law. Novelty is not a requirement under California law. The defendants recognize that. They don't argue that it should be affirmed for that reason. And we, of course, believe it should be reversed for that reason. And not only is it wrong on the law, it's also wrong on the facts. My clients came up with an original, unique, fictitious idea of having an American Civil War vet travel to Japan to train the Imperial Army. It's fictition. It's completely, whatever label you want to give it, novel is the most accurate. It is a completely novel idea. Even though novelty is not needed, it still was very novel and unique. And what we have, what we need to look at, what the district court should have looked at is, are the ideas in my client's script the same as in the movie? And they're the exact same. Are we now talking California or are you trying to do copyright at the same time? I'm going to do first the implied contract. We're still talking California, okay. And it's just involving California law. Yes, Your Honor. We have to have the same use of an idea. And here the idea is, my client's idea was, again, take this American Civil War vet, have him travel to France in 1877, I'm sorry, travel to Japan, and train an army that had no training whatsoever to fight against the samurai, have that same individual grow in sympathy and help the samurai instead of the side that he was commissioned by. That's the exact same premise of The Last Samurai. And we know this. Did your client's story include the part about switching to the other side? I thought your client, Wanda, remains opposed to The Last Samurai. Use of the term Last Samurai, the American is The Last Samurai. But he was opposed to a samurai, but not to he joined forces with the samurai. And the last fight, he stood side by side with the samurai and was saved by a samurai warrior, the female. So the side that he was asked to defeat, he actually stood and fought side by side with. And the reason why we know that both of these, that both the script and the movie are based on the same idea is because the defendants admitted at page two of their answering brief, they say the party centered their works on an American war veteran traveling to Japan to help train a newly formed imperial army in Western warfare so that it could fight the samurai. They admit both works are centered on that. The same idea was taken. Same idea was used. Compensation is due under California law. There's at least a tribal issue, which is what we're here about. And another item of evidence to show that the same ideas are used, the DVD, the ones that they're in. I got this particular one in Blockbuster. It says Tom Cruise plays a Civil War hero, Captain Nathaniel Algreen, who comes to Japan to fight the samurai, ends up pledging himself to their cause. The samurai character plays a leader facing a vanishing way of life whose destiny becomes interwoven with that of the American captain. That's the premise of our, that's the idea. Stated at that level of generality, it's obviously the same idea. Now, of course, it's written in different ways. There are various aspects of the plot that are very different. But that, if that's the idea, it's clear that it's the same idea. And I'm not, I would respectfully disagree that it's abstract. It's a specific character going to a specific. Maybe I shouldn't use the word abstract. But stated at that level of generality, it seems to, sure, it's the same idea. And that's what you need to, under California law, you need to show that the idea was solicited, that it was accepted, and that it was used. I believe we have a tribal issue as to all of those. There's not a way to know about taking the evidence on your side, because we're here on summary judgment, so your evidence is believed for present purposes. What do we know or can infer from the evidence in terms of what stages their scripts were in when? Well, the timeline, the only reasonable inference from the timeline is that they got our ideas and they used them immediately. One of the timelines is we, earlier, we orally pitched it. On May 16th, we had a messenger script sent to them. By May 19th, three days later, they had been struggling with Rest of the Rising Sun for years, with it going nowhere. Within three days of getting our messenger copy, I have the page lines, if Your Honor, here. Within three days of getting our script, all of a sudden they come up with 33 scenes, three acts, scene-by-scene description within three days of getting our script. They work pretty fast. That's a generous interpretation of facts. No, actually, this is not quite a joke. I mean, if they only had it three days before, how can they have all those ideas in sort of script form based upon your idea? They wrote all those things in three days? They lifted them wholesale from our client's script. They took the ideas and wrote them out scene-by-scene-by-scene. But the scenes are not identical. I mean, I've read the two scripts. I mean, this is back, this is 2000. There's a lot of little rewrites along the way and that type of thing, as things change with all scripts. So it wasn't the final, final product three days within. And it was a scene-by-scene outline. It wasn't the actual Nathaniel Green says this and that type of thing. I see. And do we have a copy of that outline in the record? I've got most of the ER here, and I don't have all of it. That's maybe 342. That's what I understood. Volume 2, page 219 to 227. I've got a version that's volume 3, 342. It's also called Exhibit H, page 135. It's got a fax line at the top of May 19, and it goes for, I don't know, eight or ten pages. Sorry. 342. That's the piece, and I also have gone through the record. That's the piece that sounded consistent with what you were describing. So maybe you should confirm that. It might have been submitted twice. I just want to make sure. I'm used to that. It happens a lot. I might just be looking at different copies of the same thing. Okay. Let me just – I'm sorry. I just want to make sure that my citation is the same. Right. It is. So you can either find it in volume 2 or volume 3. Okay. I've got it. It's the same. And it's as seen, it's a scene-by-scene outline, not a word-for-word. They would have worked fast, but it's certainly conceivable to write out this outline in three days. I got it. Okay. And did that answer Your Honor's question enough about that? Yes, it did. Thank you. Because there are other discrepancies with the timeline that are not necessarily discrepancies but further support copying and use of my client's ideas, we submit our – we orally pitch our idea on May 9th. May 10th, Mr. Zwick is pitching the idea orally to DreamWorks. Again, it was always – I mean, West of the Rising Sun is a samurai cattle drive movie. So it goes from a Texas cowboy going over to help with cows to the story of an American Civil War vet helping to train and fight against the samurai training and that type of thing. So the timing is very suspicious and, in addition to everything else, further creates a triable issue. So as to the implied contract, I certainly think that there's a triable issue. They did use the ideas. Currently, my client cannot market their script. They have a script about an American Civil War vet going to Japan. It has no value anymore. It's the same exact idea. As to the copyright claim, there are three elements to that. You need to be the owner of the copyright, access substantial similarities. They concede the first two. We're not – my client certainly did have the copyright, and they concede access. They have to concede access. It's undisputed that my client's agents submitted my client's script to them. So the only issue here is, is there a substantial – as to the copyright, is there a substantial similarity between my client's script and the movie? And I won't bore Your Honors with the endless similarities that are pointed out in the briefs, but just to point out a few, the exact title. They have no explanation of why West of the Rising Sun all of a sudden became titled The Last Samurai. In the movie industry, you don't change the title without reams of documents as to why you do that. There's nothing here. There's not even a memory of the defendants as to why they changed it. It's a completely original idea. The protagonist in both is an original character. There are historical errors in both the use of canons, the viewing of Mount Fuji from Tokyo Bay, and I do acknowledge that the defendants in their answering brief suggested that Mount Fuji can be seen by Tokyo Bay and referred to a website. There is a picture of an aerial plane in World War II. Off in the distance, you can see Mount Fuji. That is not the way it's depicted. In the film, that's not the way it's written into my client's script. As the boat sails into the harbor, there is this huge depiction of Mount Fuji. You simply can't see it. We're not talking about an aerial view. We're talking about on board a ship. It's a historical inaccuracy. The real problem is pollution. Even today, Mount Fuji can, from time to time, be seen from Tokyo because I've seen it. It doesn't happen very often because we've got too much stuff in the air. And it's way off in the distance as well. It used to be able to see way off in the distance. So the similarities, the timeline, the very quick turn from West of the Rising Sun to The Last Samurai, all of these things add up to facts that belay literary accident. Certainly add up to a tribal issue. We've met every element. Their responses... Fuji is squarely the concern I have, and it focuses on the copyright claim. And I have not seen the movie recently. I think I saw it shortly after it came out. I will want to see it before I finish working on this. I have looked at the scripts. And the two scripts gave me very different senses of what the stories were, the thrust of the story. I go through those lists of extrinsic elements. But it struck me that the characters, although similar with regard to a Civil War veteran going to Japan to teach the Emperor's troops how to fight, behaved in very different ways. Their conclusions were, I thought, very different. Their origins were, I thought, very different. Frankly, I thought The Last Samurai film was something of a downer except for the sudden salvation by becoming Japanese at the end. I got a much more upbeat, rousing sense from your clients. At what point does the seeming divergence or different directions of these common ideas taken cause the two to be too dissimilar for copyright protection purposes? Well, you don't necessarily look at the differences when you're examining copyright. And the similarities, the sequencing, one starts off with a flashback to Japan, a single brief scene. My client starts off the same way. You flash immediately to the protagonist back in America teaching about a war event that he was involved in. And yes, there is some portion in the middle that is slightly different, but it doesn't negate the similarities. Adding a few differences here and there does not negate the similarities. Substantial similarities. We showed in brief before the trial court showed substantial similarities. Whether or not there are also differences doesn't negate the substantial similarities. I'm sure that there's probably at some point, you know, they use the example of Romeo and Juliet and West Side Story. They're both about, you know, love struck. And, you know, okay, so there's so many, there's such a generic similarity and the differences negate any substantial similarity. We don't have that here. We do have differences, but it doesn't negate the substantial similarity and it certainly doesn't remove the triable issue of fact in it. The jury may come back and say, no, the differences do negate the substantial similarities, but my clients have the right to a jury trial on that issue. There's just too much here, there's too much coincidence, and there's too much destruction of my client's property for it not to be considered substantial similarity. Let's hear from the other side. And you've come just to the end, but we'll give you a chance to respond. Thank you. Good morning. Gary Ganz and my colleagues, Jamie Marcard and David Aronoff for the defendants and appellees. May it please the Court. In April 2000, a month before plaintiffs ever called on Bedford Falls, Ed Zwick, the director of the picture, and a writer and a producer of the picture, and John Logan, another writer of the picture, faxed each other historical, pages from historical texts about the Satsuma Rebellion. The Satsuma Rebellion was a military and really a metaphoric battle between the young emperor who wanted to modernize Japan and the samurai who represented the traditional culture. Now one of those historical texts talks about the rebellion as a momentous clash between the traditional Japanese warfare and the new peasant army trained in Western military strategy and using Western modern weapons. It describes L.L. Janes as a former U.S. Army officer who came to Japan to help modernize the army. It talks about Saigo Takamori, known commonly as the last samurai, who led the samurai in the rebellion. And it talks about how when the samurai were defeated by the Imperial Army, Takamori committed ritual suicide. Plaintiffs do not own any of these fax and nobody does. At the same time, again, long before plaintiffs ever showed up. I've got most of the E.R. down here with me. Can you point me to those faxes that you're talking about? Yes. That would be S.E.R. 30 to 32. Oh, I've got the S.E.R., okay, 30 to 32? Yes. I've just gotten it. 30 and 31, that's just an article. It doesn't tell me when it was sent. There's a fax header at the top of the page saying April 21. 4-21, okay.  Yes, there is a text to this. Email? Is it just the text of this fax or is there just sending all these articles? You know, I don't know for sure. I think the text is the handwriting on the right side of S.E.R. 30, which says, John, more to come, Ed. Let me make sure I have a handle on the issue that you're discussing here. I mean, I think there are a couple of different possibilities. One is what I'll call independent origin prior to any knowledge of what plaintiffs had to offer up. And I hear what you're saying now is speaking more to that than to what I'll call the second potential line of defense, and the one that I think the summary judgment was more constructed on, and that is whether there was access or not prior to the time of creation by defendants, there was not sufficient similarity between the two works. I understand both are viable defenses, but I guess my mind was calibrated more for the second, and if your presentation is based on the first, I want to make sure I understand that. There's two points that I'm trying to make from this material. One is these are historical facts. Historical facts nobody owns. Plaintiffs certainly did not own them, and they have to be filtered out of the substantial similarity analysis. The second point is addressing counsel's argument about the timing and under the implied contract claim, the use of the material that allegedly was provided by the plaintiffs. And I think this facts answers both questions. These are historical facts. Well, on the first part, the historical facts, it's my impression that the historical facts idea potentially could be a subject of a California State contract claim. The difference between the two claims is for copyright protection, you plainly have to have something that's copyright protectable. That limitation doesn't apply to the California contract claim, so that if somebody has the genius idea to make a film about the 1924 Paris Olympics and turns it into chariots of fire, that idea may have been enough to spawn a California contract claim. Let me address that point because that's obviously an important point. The contract here, the implied contract here, and defendants deny there was an implied contract, but to the extent that there was an implied contract, the sole evidence of the terms of the contract come from the affidavit of the plaintiff's agent. He was the only one that communicated with defendants, and he allegedly sent the screenplay to them. And what he said in terms of the contract, it's very clear. He says, if the capital S screenplay was used to produce a feature film, my clients would be compensated. So the implied contract here involves the plaintiff's screenplay, not general ideas. This is not like most pitch cases where you have an oral presentation of a minute or two of general ideas. And so... No, no, I focused on that language. Use is a very broad and generic term, and use I don't see as necessarily restricted to you take my script, you use my script and make a movie from it. Another use, and I think it's within the normal English definition of use, is they used it for a lot of ideas that were in it. But I think the law is, under implied contract law in California, that if you submit the full literary work, then the issue is the substantial similarity between the expression in that work and the expression in the defendant's work, which is analogous to a copyright standard rather than an IP submission case. I just have to say I don't read California law that way. I mean, I read the Wilder opinion that's reproduced, and I view that as probably that's, I think that's what California law is. I don't think it's, I don't think it provides that little protection to someone who provides a full script. Well, in Wilder, I actually think Wilder is analogous, and let me tell you why. In Wilder, Desney calls up Billy Wilder and pitches an idea. The secretary says at some point we need something in writing, and there's another occasion in which he calls back and he dictates a four-page treatment. What the Wilder court said is that what is protected is the treatment, not the ideas. Not the ideas and the treatment. And, in fact, if I can read briefly from Wilder, I think they discussed this point. And what they say on page 750 is, inasmuch as plaintiff's story is taken from the public domain and as both his story and that of defendants are in principal substance historically accurate, it must be borne in mind that the mere facts that the plaintiff submitted and offered to sell to defendants, a synopsis containing public domain material, and that thereafter defendants used the same public domain material, will not support an inference that defendants promised to pay for either the synopsis or for the idea of using the public domain material. The plaintiff can have no property right in the public domain facts. And then it goes on, on the other hand, the fact that plaintiff and public – that plaintiff used public domain material in constructing his story and synopsis would afford no justification whatsoever for defendants to appropriate plaintiff's composition and use it or any part of it in the production of a photo play. And so what they're saying is the ideas that were orally conveyed are not protected by implied contract. Well, but listen to this. This is also from Wilder, although it's – and now this is the very long quotation of Wilder that's contained in Blastheim. The person who can and does convey a valuable idea to a producer who commercially solicits the service or voluntarily accepts it knowing that it is tender for a price should be entitled to recover. That's right. But there is a distinction developed not only in Desney but also in the Ware case and also in the Clicas case between when you submit a full-blown literary work and you merely pitch ideas. So if you pitch an idea, you have more protection than when you submit a full-blown script that has the idea? You have a broader – you have protection of ideas that you do not have when you submit a full-blown script. That just doesn't make any sense to me, and I don't think that's California law. Well, I think that's what Desney says, and the reason it makes sense to me is the following. If you submit a script, 120-page script, and the law is that ideas, historical facts, all this is protected, you have a tremendous amount of material, ideas, facts, et cetera, that are now the defendant cannot use. So if you take the example of a movie studio and somebody submits a script with a short history of the United States, idea of George Washington did this and Thomas Jefferson, et cetera, et cetera, it's now the studio cannot make a movie about it. But it can't be – that can't take you as far as you want to go. That is to say, under your theory, if these plaintiffs had submitted an outline that said, okay, here's my idea, American Civil War veteran with troubled past and bad dreams about something goes to Japan, signs up with the emperor, trains the emperor's troops, fights with the samurai, da-da-da-da-da. If they pitched that, in your view, that's a protectable idea under California contract law? Yes. But if they had that very same idea embodied in a full script, it's not protected. That's right, only the expression of the idea. That can't be. I think that's what Ware provides and I think that's what Desney provides. But I also think that in this case, and this goes back to the first question from Judge Clifton, those ideas were facts between the writers and the director of the movie. Yeah, well, that's the other issue, and Judge Clifton, I think, is right to say, well, that's another defense, that they had it already in their heads before they ever saw the script. Yes, and indeed they did. So getting back to copyright for a moment, under Cavalier and other cases, you filter out the historical facts, you filter out the general ideas, the scenes of fare that flow from those facts, the historical characters, and the ideas. And I think what we have left here is two starkly dissimilar works. The characters are different. The plot's different. The themes are different. It's a completely different work once you filter out those materials. Now, I also want to make sure I address the statute of limitations argument as well. Plaintiffs filed their complaint exactly two years after the film was released to the public. So if plaintiff's claim accrued even a day before the picture was released, it's barred by the statute of limitations, and I don't think there's any dispute about that. The district court denied our motion for summary judgment on that ground because it found there was a tribal issue as to whether the use constituting that triggered the statute of limitations was a release of the picture or something earlier. And it was after the court made that ruling that plaintiffs submitted the sole evidence of the terms of the contract, which is the affidavit of Mr. Phillips that I read earlier. And Mr. Phillips said, My clients are entitled to be compensated if the screenplay is used, quote, to produce a feature film. It is unquestioned that that is the term of the contract to the extent that there is a contract. Necessarily, the film was produced before it was released. It can't be produced after it was released. Well, that's an interesting argument, but it seems to me entirely possible that use in terms of what the contract contemplates and use for purposes of the statute of limitations may have different timelines and that the use sort of culminates for purposes of starting the statute at such time as it is used to make money. That is to say, they're first starting writing scripts, well, they're not making any money yet. I think it's a plausible reading of California law that use for purposes of the statute of limitations doesn't start until release. The district judge didn't decide that question. That's right. But I think Blaustein case, for example, says you can make a contract however you want. You can make a contract that says you get paid any time they exploit the screenplay, whether or not a movie is produced or released. And I think that fits with general contract law. Parties can define the contract terms however they want. And in this case, they define the contract terms to be you get paid if the movie is produced. One example that I could raise and I think it's reflected by reality is let's say hypothetically that on May 16, defendants get a copy of the screenplay, plaintiff's screenplay. A week later, they sell the screenplay to Warner Brothers for a million dollars. Change the name of the author on it. They sell it to Warner Brothers for a million dollars. Warner Brothers never makes the movie. It's never released. Do plaintiffs have a claim for breach of an applied contract? I think certainly they do. Their property was used. Or to use the terms that Mr. Phillips used, let's say the movie was produced and then they decided not to release it. Now, I'm not speaking for my colleagues because we have not consulted on this ahead of time. My own inclination is if I would reverse unsummary judgment on California law, I would simply let the district judge decide the question that district judge has not yet decided. I understand that, but I think the only evidence in the record, and it's plaintiff's evidence, it's not even our evidence, is this is the term of the contract. And under that hypothetical, if defendants made a million dollars based on their screenplay, the movie was produced but never released, I think we would be here on different issues because I think plaintiffs would feel that they have a claim anyway, and I think they would. I'm arguing to my colleagues, not to me. I've said to you I'm not deciding that issue. Okay. At any rate, that's the way the movie business works. Before the movie is released, the director gets paid, the writers get paid, producers get paid. They all make money. They've all taken advantage of whatever literary work they had in front of them before the movie is released. So I don't think that it makes sense on the record before the court to say that the statute of limitations did not run before the release of the picture. Thank you. Okay. Before you leave, in your brief, you offer or propose to submit copies of the DVD to the court. Speaking at least for myself, I'll or will accept those copies. You can work out with the deputy clerk how best to submit them. But I appreciate the offer. I think it's important. But I have not yet looked at the film, and will look forward to doing so. All right. Thank you. Would you like to respond? Thank you, Your Honors, for the opportunity to respond. Opposing counsel mentioned the April 20th letter as evidence that this was an idea that they had had, et cetera. It does go to independent creation. We're not here about independent creation. But that letter, it was an article about the Samurai Rebellion. And the rest of the timeline on May 11th, Mr. Wickwright, I don't think it's too early to begin considering a context for our hero. This is after they got our pitch. Who is he in America, and who is he in Japan? So they have an article about the Samurai Rebellion. They don't have their script even beyond who's going to be our protagonist. And it goes on. May 11th, Mr. Zwick admits that, yeah, one never stops exploring possibilities. May 12th, the writer, Mr. Logan, says that he was only in the very preliminary research stages. May 15th, Mr. Zwick complained that DreamWorks responded, yeah, yeah, yeah, all this Japanese stuff is great, but what about the white guy? So they don't have the idea that they would like to imply was fully developed before they got my client's screenplay. As a matter of fact, my client's submission coincided perfectly with their ability to use it and develop their screenplay. And the writer himself acknowledges that he knows nothing about Japan or Japanese history, versus my client, Aaron Bonet, he has a master's in Japanese history. He's very familiar with it. So one article about the Samurai Rebellion doesn't mean that all of a sudden it was independently created before they got my client's script. Also, there was a real problem at the district court level, and still here. The facts headers and dates were changed on the critical documents just because- That issue, if we send it back to the district court, there's a possible implied contract in terms of the use. That can all be sorted out. I don't think we're in a position to sort that out. And just my point is we can't accept the May 20th as conclusive evidence that that occurred on that day. And then the only other thing I would conclude with, and I see I'm out of time, the statute of limitations, California law is very clear. Donahue, Miller v. Merrimack, it doesn't begin until the release of the film, and we filed a claim. You're arguing that to my colleagues. Thank you. But we appreciate the argument. Thank you, Your Honor. Thank you very much for your arguments. Bonet v. Warner Brothers submitted the claim. That concludes our arguments for the day. We are in adjournment until tomorrow morning. Thank you.
judges: Singleton, Fletcher W. , Clifton